WETHERELL, J.
Silver Shells Corporation (Developer) appeals the partial summary judgment in favor of St. Maarten at Silver Shells Condominium Association (Association) ordering the Developer to turn over control of Silver Shell Property Owners Association (Master Association) to the unit owners and to convey what the parties refer to as “the Beach Property” to the Master Association. The Developer contends that the Association’s claims related to the Beach Property are barred by the statute of limitations and that turnover of the Master Association is not yet required by the Declaration of Restrictive Covenants and Easements for Silver Shells (Restrictive Covenants). We agree. Accordingly, we reverse the partial summary judgment in favor of the Association.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998, the Developer commenced development of the Silver Shells Beach Resort pursuant to a master plan and development agreement approved by the City of Destín. The Resort was to include six individual condominium towers, a clubhouse, and the Beach Property. To date, the Developer has completed five of the six condominium towers, including the St. Maarten tower. The remaining tower, St. Kitts, is under an active development order but construction has not yet begun. Each completed tower has a separate condominium association that administers and maintains the tower’s common elements. The Association is the condominium association for the St. Maarten tower.
On May 27, 1999, the Developer recorded the Restrictive Covenants for the Resort property. The Restrictive Covenants created the Master Association to administer and maintain the “common properties” of the Resort. Each tower’s condominium association has a representative on the board of the Master Association, but the board is controlled by the Developer until *199 “turnover.” Under the Restrictive Covenants, turnover of the Master Association to the unit owners is to occur:
at the earlier of ninety (90) days after the conveyance by the Developer of ninety percent (90%) of all Units owned by Developer and to be located within the Property, or twenty (20) years from the date of recordation of this Declaration; or when so required by law.
At turnover, the Developer is required to convey the Resort’s “common properties” to the Master Association. The Restrictive Covenants define the common properties to include Lot 7A, which is the Beach Property. However, the Restrictive Covenants also excepted from the common properties:
that portion of Lot 7A hereafter designated by Developer, upon which Developer may later construct the beachfront pavilion and other amenities described in Paragraphs 2.8 and 2.10 of the [Restrictive Covenants].
Such designation may be made at any time by Developer prior to turnover without the joinder or consent of any third party; and further, upon such designation, shall be deemed to be a portion of the Clubhouse Property.
On December 4, 2000, the Developer recorded an amendment to the Restrictive Covenants designating all of the Beach Property as “Clubhouse Property.” The effect of this amendment was to remove all of the Beach Property from the common properties that the Developer has to convey to the Master Association upon turnover because, under the Restrictive Covenants, ownership of the Clubhouse Property is retained by the Developer.[1]
On March 30, 2009, the Association filed a complaint against the Developer seeking, among other things, a declaratory judgment concerning the ownership of the Beach Property. The complaint alleged that the Restrictive Covenants did not authorize the Developer to remove the entire Beach Property from the Resort’s common properties and that the trial court should equitably reform the Restrictive Covenants to reflect that the Beach Property, less that portion of the property on which a beach pavilion was constructed, was part of the common properties. The complaint also sought an order requiring the Developer to convey the common properties (including the Beach Property, less the beach pavilion) to the Master Association under the turnover provision of the Restrictive Covenants because the Developer had conveyed 90% of the units in the five completed condominium towers as of July 15, 2005. Finally, the complaint sought a declaratory judgment and damages relating to dues charged to the unit owners by the Developer for the use of the Clubhouse Property within the Resort.[2]
The Developer filed an answer denying the Association’s claims. The answer also raised several affirmative defenses, includ-' ing the defense that all of the Association’s claims were barred by the statute of limitations.
The Association filed a motion for partial summary judgment on its claims relating to the ownership of the Beach Property and turnover. The Association argued that it was entitled to judgment as a mat *200 ter of law on its claims related to the Beach Property because the Restrictive Covenants permitted the Developer to retain only a portion, not all, of the Beach Property; and, the Association argued that it was entitled to judgment as a matter of law on its turnover claim because, based on the definition of “unit” in the Restrictive Covenants, only the constructed units were to be considered in determining whether the turnover requirement had been triggered. The Developer filed a response to the motion in which it argued that the motion should be denied because the Association failed to refute the Developer’s statute of limitations defense on all claims. With respect to turnover, the Developer contended that the Association was not entitled to summary judgment in its favor because the Restrictive Covenants provided that “all Units ... to be located on the Property,” including those in the planned St. Kitts tower, were to be considered in determining whether the turnover requirement has been triggered.
After a hearing, the trial court entered an order granting the Association’s motion for partial summary judgment. With respect to the Beach Property, the trial court determined that the Restrictive Covenants “only allowed the Developer to retain a portion of the beach for the Beach Pavilion — not the entire beach.” With respect to turnover, the trial court determined that “[t]he proposed units in St. Kitts are not Units as that term is defined by the Restrictive Covenants because the St. Kitts tower is not constructed and the Developer has never filed a declaration of condominium dedicating the real property where the Developer intends to build St. Kitts for use as a condominium” and, therefore, turnover should have occurred on October 13, 2005, which is 90 days after the date that 90% of the units in the five completed towers had been conveyed by the Developer. Based on these determinations, the trial court invalidated the amendment to the Restrictive Covenants designating the entire Beach Property as Clubhouse Property and ordered the Developer to complete turnover, including conveyance of Beach Property (less the portion on which the beach pavilion was constructed) to the Master Association, within 30 days.[3]
This appeal followed.

ANALYSIS

We have jurisdiction to review the non-final order granting partial summary judgment in favor of the Association pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii). Our standard of review is de novo. See Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001); Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1095-96 (Fla. 1st DCA 1999).
The Developer raised six issues on appeal: the statute of limitations bars the Association’s claims related to the ownership of the Beach Property (Issue I) and its claim regarding turnover of the Master Association (Issue II); the trial court’s rulings concerning the Beach Property (Issue III) and turnover (Issue IV) were erroneous on the merits; the Master Association and the company that leased the Beach Property from the Developer should have been joined as indispensable parties (Issue V);[4] and the Association failed to *201 refute the other affirmative defenses asserted by the Developer (Issue VI). We find Issues I and IV dispositive, as discussed below. Accordingly, we need not address the other issues raised by the Developer.

Beach Property

The Developer argues that the Association’s claims concerning the Beach Property are barred by the five-year statute of limitations in section 95.11(2)(b), Florida Statutes, which applies to “[a] legal or equitable action on a contract, obligation, or liability founded on a written instrument.” The Association responds that its claim challenging the validity of the amendment to Restrictive Covenants is a reformation claim, not a breach of contract claim, and therefore the claim is subject to section 95.281(2), Florida Statutes, which provides that “[a]fter 20 years from recording of a deed ..., no person shall assert any claim to the property against the claimants under the deed ... or their successors in title.”
The Association’s claims regarding the Beach Property arise from the Developer’s alleged violation of the Restrictive Covenants, which is akin to a breach of contract action. The fact that the remedy sought by the Association for the alleged breach was the “equitable reformation” of the Restrictive Covenants through the invalidation of the amendment does not change the nature of the underlying claim. It also does not implicate section 95.231(2) because that statute applies “only to correct technical defects in an otherwise valid deed.” Davis v. Hinson, 67 So.3d 1107, 1111-12 (Fla. 1st DCA 2011); see also Holland v. Hattaway, 438 So.2d 456, 461 (Fla. 5th DCA 1983). Accordingly, we agree with the developer that the Association’s claims related to the Beach Property are subject to the five-year statute of limitations in section 95.11(2)(b).
The circumstances of this case are similar to Harris v. Aberdeen Property Owners Ass’n, Inc., 135 So.3d 365 (Fla. 4th DCA 2014). The plaintiff in that case filed a declaratory judgment action in 2010 challenging a 2004 amendment to the governing documents of a homeowners’ association. Id. at 367. The trial court found that the claim was barred by the statute of limitations because it was filed more than five years after the challenged provision was recorded. Id. The Fourth District agreed that the five-year statute of limitations in section 95.11(2)(b) applied, id., and affirmed the summary judgment on the plaintiffs challenge to the validity of the amendment. Id. at 268. The court stated: “To the extent Harris challenges the validity and the enactment of the mandatory membership amendment, we agree with [the homeowners’ association] that the statute of limitations with respect to such a challenge began to run from the 2004 date the amendment was recorded in the public records.” Id.
Likewise here, the Association’s claims relating to the validity of the amendment to the Restrictive Covenants, which removed all of the Beach Property from the common properties, accrued on December 4, 2000, when the amendment was recorded in the public records. However, the statute of limitations on this claim did not begin to run as to the Association until December 31, 2002, when control of the Association was turned over to the unit owners. See § 718.124, Fla. Stat. (“The statute of limitations for any actions in law or equity which a condominium association ... may have shall not begin to run until the unit owners have elected a majority of the members of the board of administration.”); Charley Toppino & Sons, Inc. v. Seawatch at Marathon Condo. Ass’n, 658 So.2d 922, 925 (Fla.1994). The Association had five years from that *202 date (until December 31, 2007) to file suit. It did not so. Accordingly, the Association’s claims challenging the validity of the amendment to the Restrictive Covenants that removed the entire Beach Property from the Resort’s common properties are time-barred.
We have not overlooked the fact that the Harris court reversed the grant of summary judgment on the plaintiffs declaratory judgment claim that sought an interpretation of conflicting provisions in the governing documents for the homeowners’ association. See 135 So.3d at 369. The court explained that, unlike the claim challenging the validity of the amendment, the declaratory judgment claim was not time-barred because all of the elements of declaratory relief were not present until the plaintiff took title to the property in 2006 and the plaintiff filed suit within five years of that date. Id. at 368-69. Here, by analogy, all elements of declaratory relief were not present until control of the Association was turned over to the unit owners on December 31, 2002. The Association’s declaratory judgment claim as to the Beach Property was not filed within five years of that date. Therefore, even were we to construe this claim as seeking something other than the invalidation of the amendment to the Restrictive Covenants which removed the Beach Property from the common properties, the claim would still be time-barred.
Nor have we overlooked the Association’s argument that its claims, related to the Beach Property were timely filed because its need for a declaration concerning the ownership of that property did not arise until October 2005 (when, according to the Association, the Developer was obligated to convey the common properties to the Master Association as part of turnover) or December 2007 (when the Developer refused the Association’s demand that it comply with its turnover obligations). However, we reject this argument because, as discussed below, the Developer’s obligation to convey the Beach Property and other common properties to the Master Association has not yet been triggered.
Finally, we have not overlooked Silver Beach Investments of Destin, LLC v. Silver Beach Towers East Condominium, 39 So.3d 324 (Fla. 1st DCA 2010), in which this court affirmed an order requiring a developer to convey a beachfront parcel to the master association of another multi-tower condominium project in Destín. There, as here, the developer unilaterally amended the restrictive covenants for the project to remove the beachfront parcel from the project’s common properties. This decision is not binding precedent here because it was a per curiam affirmance, see Dep’t of Legal Affairs v. Dist. Ct. of Appeal, 5th Dist., 434 So.2d 310, 311 (Fla.1983), and the decision is distinguishable in any event because the complaint in that case was filed after turnover and within five years after the amendment was recorded.
In sum, because we conclude that the Association’s claims regarding the Beach Property were time-barred, we need not consider the Developer’s argument that the trial court erred when it invalidated the amendment to the Restrictive Covenants that removed the Beach Property from the Resort’s common properties. Accordingly, we express no opinion on the validity of the amendment or the propriety of trial court’s ruling that the Restrictive Covenants permitted the Developer to remove only a portion, and not all, of the Beach Property from the common properties.

Turnover of the Master Association

With respect to the turnover issue, we begin with the Developer’s argument that the Association’s claim is barred by the *203 statute of limitations. We reject this argument because, as discussed below, the trial court misconstrued the applicable provision of the Restrictive Covenants in ruling that the Developer’s obligation to turn over control of the Master Association to the unit owners was triggered in 2005. Accordingly, the turnover claim asserted by the Association is not barred by the statute of limitations; it is premature.
As previously stated, the Restrictive Covenants require the Developer to turn over control of the Master Association to the unit owners
at the earlier of ninety (90) days after the conveyance by the Developer of ninety percent (90%) of all Units owned by Developer and to be located within the Property, or twenty (20) years from the date of recordation of this Declaration; or when so required by law.
(emphasis added). Only the bolded language is at issue here because it has been less than 20 years since the Restrictive Covenants was recorded[5] and the Association has not identified any law requiring turnover at this point.
The Developer contends that in order to give effect to the entirety of the bolded language, turnover is not triggered until 90% of “all units” — including those in the five completed towers and those “to be located” in the planned St. Kitts tower— have been conveyed by the Developer. By contrast, the Association contends that because the term “unit” is defined in the Restrictive Covenants to mean “any portion of a completed building,” turnover was triggered when 90% of the units in the five completed towers had been conveyed by the Developer on July 15, 2005.[6]
The interpretation of the Restrictive Covenants is governed by the law of contracts. “In construing the language of a contract, courts are to be mindful that ‘the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose.’” Taylor v. Taylor, 1 So.3d 348, 350 (Fla. 1st DCA 2009) (quoting Delissio v. Delissio, 821 So.2d 350, 353 (Fla. 1st DCA 2002)). To that end, a cardinal principle of contract interpretation is that the contract must be interpreted in a manner that does not render any provision of the contract meaningless. See Bethany Trace Owners’ Ass’n, Inc. v. Whispering Lakes I, LLC, 155 So.3d 1188, 1191 (Fla. 2d DCA 2014) (“When interpreting contractual provisions, courts will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so. Instead, courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none.”) (internal quotations and citations omitted); Universal Prop. & Cas. Ins. Co. v. Johnson, 114 So.3d 1031, 1036 (Fla. 1st DCA 2013) (explaining that “a contract will *204 not be interpreted in such a way as to render a provision meaningless when there is a reasonable interpretation that does not do so”).
The clear purpose of the turnover provision in the Restrictive Covenants was to give the Developer control over the Master Association for up to 20 years while the Resort was under development, so long as the Developer continued to have a substantial stake in the project through its ownership of more than 10% of the units that will be served by the Master Association upon build-out of the Resort. This purpose would be frustrated if, as the Association contends, the Developer was required to turn over control of the Master Association to the unit owners upon the sale of 90% of the units in the completed buildings even though such units make up less than 90% of the total number of units to be located in the Resort that will be served by the Master Association.
The Developer’s interpretation of the turnover provision comports with logic and reason and gives effect to the entire provision. By contrast, the interpretation advocated by the Association renders meaningless the key phrase “all Units ... to be located within the Property” because this phrase plainly refers to all six of the towers planned for the Resort, not just those completed at the time the Association happened to file suit. Accordingly, because the Developer’s interpretation is more reasonable and gives meaning to the entire turnover provision, the trial court erred in adopting the interpretation advocated by the Association.
In reaching this conclusion, we have not ignored the Association’s argument— which the trial court adopted — that, because the definition of “unit” refers to “completed buildings,” only the units in completed buildings are to be considered in determining whether the Developer’s turnover obligation has been triggered. However, this argument not only fails to give effect to the “to be located within the Property” language in the turnover provision, but it would give an absurd meaning to this provision by requiring turnover of the Master Association upon the conveyance of 90% of the units any of the individual completed towers even though other towers were under construction.[7]
There is no indication in the record that the Developer has abandoned its plans for the St. Kitts tower, and it is undisputed that the Developer has not yet conveyed 90% of the 513 units[8] that are to be located within the Resort when the St. Kitts tower is completed. Accordingly, the trial court erred in determining that the Developer’s turnover obligation has been triggered and in ordering the Developer to turn over control of the Master Association to the unit owners.

CONCLUSION

In sum, because the Association’s claims related to the Beach Property are barred by the statute of limitations and because the Developer’s turnover obligations under the Restrictive Covenants have not yet *205 been triggered, we reverse the order directing the Developer to complete turnover and to convey the Beach Property to the Master Association.
REVERSED.
ROBERTS and OSTERHAUS, JJ., concur.

. The practical significance of the Developer retaining ownership of the Beach Property is that the Developer is able to control the use of the beach and keep the substantial income that is apparently derived from the rental of beach chairs and umbrellas, both now and after control of the Master Association is turned over to the unit owners.

. This claim is not at issue in this appeal and remains pending in the trial court.

. The trial court stayed the order pending disposition of this appeal.

. The Developer "withdrew” Issue V after briefing was completed. Accordingly, we express no view on that issue or the related issue of whether, based on section 718.124, Florida Statutes, the Master Association might be able to assert the claims raised by the Association in this case when the Developer turns over control of the Master Association to the unit owners.

. The 20-year period will expire on May 27, 2019.

. Additionally, at oral argument, the Association argued for the first time that the units in the planned sixth tower should not be considered in determining whether turnover has been triggered because the Developer sold the property on which the tower was to be located to a third party and, thus, such units are not “Units owned by the Developer.” There is no record evidence to support the factual assertion underlying this argument, and even if there was, it would make no difference because the Restrictive Covenants and the development agreement for the Resort are recorded in the public records and run with the land. Moreover, the definition of Developer in the Restrictive Covenants specifically includes "Silver Shells Corporation ... and its successors and assigns who acquire any portion of Silver Shells Beach Resort for the purpose of development .... ”

. The Association conceded in its answer brief that, under its interpretation of the turnover provision, the Developer’s turnover obligation may have been triggered upon the sale of 90% of the units in the first tower. This concession demonstrates the absurdity of the interpretation advocated by the Association because, under this interpretation, the unit owners of the first tower would have had the right to control the Master Association responsible for administering the common properties of the entire Resort even though 5/6 of the Resort was still under development.

. This figure includes the 435 units in the five completed towers and the 78 units planned for the St. Kitts tower.