# Third District Court of Appeal

## State of Florida

Opinion filed May 14, 2025.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D23-1697
Lower Tribunal No. 18-17029-CA-01

————————————

**Paraiso CU-1, LLC, et al.,**
Appellants,

vs.

**PRH Paraiso Four, LLC,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Oscar Rodriguez-Fonts and William Thomas, Judges.

Taylor Corwin & Van Cleaf, PLLC, Timothy S. Taylor, and Vanessa A. Van Cleaf, for appellants.

Coffey Burlington, P.L., Susan E. Raffanello, and Daniel F. Blonsky, for appellee.

Before LINDSEY, MILLER, and GOODEN, JJ.

MILLER, J.

In this garden-variety real estate dispute, appellants, Paraiso CU-1, LLC ("Paraiso") and Fernando Gitter, challenge a final judgment rendered in favor of appellee, PRH Paraiso Four, LLC (the "Developer"), following a nonjury trial. The dispositive issue on appeal involves the interpretation of a cancellation provision in the parties' preconstruction Commercial Unit Purchase Agreement. We have jurisdiction. See Fla. R. App. P. 9.030(b)(1)(A).

**I**

Gitter controls several entities which lease commercial real estate to tenants. In 2015, he learned of the Paraiso Bayviews project—a mixed-use condominium—and visited the sales center with his real estate broker. His broker emailed him the Developer's floor plans and pricing information for five commercial units.

On July 25, 2015, Gitter executed a Commercial Unit Purchase Agreement (the "Agreement") for the largest of the units, Unit CU-1, for $2,360,900.[1] The preconstruction Declaration, which was recorded in 2014, defined "Unit Boundaries" pursuant to a perimetrical measurement method

---

[1] The parties first inadvertently executed a residential purchase agreement containing a considerably narrower cancellation provision.

2

excluding common elements. The Agreement stated that the Declaration "as amended" would create the "legal description of the Unit . . . ."

Gitter concurrently executed an amendment to the Agreement (the "Size Amendment"), which obligated the Developer to construct the unit "substantially in accordance with" the floor plan. The Size Amendment incorporated as Exhibit A the floor plan that the Developer furnished to Gitter earlier. On the floor plan, Unit CU-1 measured 3,628 square feet and the purchase price was $650 per square foot. The Size Amendment confirmed that "[a]t or prior to closing, [the Developer] shall cause the Condominium Documents to be amended to designate and reflect the Unit . . . ."

Gitter also signed the architectural plan and acknowledged receipt of all preconstruction Condominium Documents. "Condominium Documents" were defined in the Agreement as "the Declaration included in the Prospectus and the attached exhibits . . . ." The Declaration defined itself as the 2014 preconstruction Declaration "and all exhibits attached hereto, as same may be amended from time to time." The condominium documents also included marketing materials, the articles of incorporation, bylaws, the estimated operating budget, a form of agreement for sale or lease, the plot plan, floor plan, survey of land, and graphic descriptions of the project.

Section 36 of the Agreement granted Gitter an unfettered right to cancel "for any reason whatsoever, including any dissatisfaction . . . with this Agreement or the Condominium Documents, within fifteen (15) days of the date [Gitter] executes this agreement or has received the Condominium Documents, whichever is later . . . ."

Section 14 of the Agreement, which addressed conflicts in the square footage, contained the following disclaimer:

> [I]n the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

Next, section 14 emphasized the importance of the preclosing inspection:

> [D]uring the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed to Buyer at any time prior to closing, whether included as part of the Condominium Documents, Seller's promotional materials or otherwise.

Over the ensuing two years, Gitter paid a $1,180,450 deposit and assigned all his "right[s], title and interest in" the Agreement to Paraiso, a Florida limited liability company. However, he remained personally liable to the Developer under the contract.

4

On April 19, 2018, the Developer informed Paraiso that Unit CU-1's floor plan had been modified and would be reflected in forthcoming amended condominium documents. Approximately a week later, Paraiso requested a copy of the amended documents and demanded access to the unit for "a survey professional to determine the true measurement of the Unit . . . ." Having received no response, Paraiso renewed its request the following month and indicated it would cancel the Agreement and seek return of its deposit if the Developer "unilaterally schedule[d] the closing before" providing the amended documents and allowing it to inspect the unit.

On May 18, 2018, the Developer refused the request because the documents were not yet available and explained it could not allow Paraiso to access the unit since it was "part of an active construction site."

On May 22, 2018, Paraiso brought suit against the Developer for injunctive relief, seeking to compel access to the unit and prevent the Developer from scheduling the closing before Paraiso had "a meaningful opportunity to conduct a survey and inspection and otherwise investigate the material discrepancy in square footage."

On July 17, 2018, the Developer delivered the amended condominium documents and rescheduled closing to August 1, 2018. The amended Declaration revealed that Unit CU-1 now measured 3,314 square feet

according to its perimetrical boundaries instead of the 3,628 square feet reflected on the floor plan.[2]

On July 30, 2018, Paraiso invoked the 15-day cancellation provision under section 36 of the Agreement and demanded return of the deposit due to the size discrepancy.  It then amended its complaint to allege claims for breach of contract and the implied covenant of good faith, rescission, and a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  See §§ 501.201 et seq., Fla. Stat. (2015).  The Developer filed a counterclaim against Paraiso and a third-party complaint against Gitter for breach of contract based on the failure to close.

On July 5, 2019, the Developer sold Unit CU-1 to a third party for $1,500,000.  Paraiso again amended its complaint to recover the remainder of its deposit under the alternative theory that the Developer breached the Agreement by failing to return the remaining deposit funds following resale to a third party.[3]

_____

[2] The sole testifying surveyor confirmed that Unit CU-1's interior perimetrical boundaries measured 3,314 square feet.  This was a discrepancy of 314 square feet between the floor plan and the as-built unit, or an 8.7 percent reduction in size.

[3] Section 13 of the Agreement provided that "if Seller's Damages are less than the amount of Buyer's deposits and other prepayments, then Seller shall, within fifteen (15) business days following the calculation of Seller's Damages, return to Buyer the amount by which Buyer's deposits and

6

The trial court convened a bench trial. At the conclusion of trial, the court ruled in favor of the Developer, finding that Paraiso accepted the unit upon signing the Agreement in 2015. But it did not address the FDUTPA claim. The court awarded the Developer $1,157,651.36 in damages consistent with a stipulated methodology set forth in the Agreement, leaving the Developer with a windfall of $22,798.64 in deposit funds. The parties then filed dueling motions for entry of final judgment and entitlement to attorney's fees. Because the court further found the Developer was the prevailing party, it ordered that the remaining deposit funds would offset a later fee award. This appeal ensued.

## II

## A

The construction of a contract presents a question of law subject to de novo review. See D & E Real Est., LLC v. Vitto, 260 So. 3d 429, 433 (Fla. 3d DCA 2018).

---

prepayments exceeded Seller's Damages. . . . Buyer shall simultaneously deliver to Seller a full and complete release from any and all claims and/or liabilities arising out of, or in connection with, this Agreement, if so requested by Seller." It is undisputed that, under the Agreement's methodology, the Developer's damages were less than Paraiso's deposit and prepayments.

7

**B**

The dispositive issue on appeal involves the interpretation of the 15-day cancellation provision in the Agreement. This is a question of contractual construction. We therefore begin our analysis with the words of the text, while remaining cognizant that "the traditional canons of . . . interpretation can aid the interpretive process from beginning to end . . . ." Conage v. United States, 346 So. 3d 594, 598 (Fla. 2022). "[T]he most fundamental semantic rule of interpretation" is the ordinary meaning canon, which provides that "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012 ed.); see also Talbott v. First Bank Fla., FSB, 59 So. 3d 243, 245 (Fla. 4th DCA 2011) ("When the language of a contract is clear and unambiguous, courts must give effect to the contract as written and cannot engage in interpretation or construction as the plain language is the best evidence of the parties' intent."). In this vein, the court must interpret a contract "in a manner that accords with reason and probability," endeavoring to "avoid an absurd construction." Katz v. Katz, 666 So. 2d 1025, 1028 (Fla. 4th DCA 1996).

The contract must further be construed as a whole.  See Super Cars of Mia., LLC v. Webster, 300 So. 3d 752, 755 (Fla. 3d DCA 2020).  Whenever possible, we must give each word and provision effect and avoid an interpretation that renders any term superfluous.  See Patino v. State, 390 So. 3d 164, 169 (Fla. 3d DCA 2024); see also Morgan v. State, 295 So. 3d 833, 836 (Fla. 4th DCA 2020) ("Under the harmonious-reading canon, 'there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.'  The purpose for this canon is to make the provisions of the [contract] text be interpreted in a 'compatible' not 'contradictory' manner.") (quoting Scalia & Garner, Reading Law: The Interpretation of Legal Texts 180).

Here, the plain language of section 36 ties the right to cancel the Agreement to the receipt of the "Condominium Documents."  By definition, the "Condominium Documents" include the Declaration "as same may be amended from time to time" and "as amended."  This language accounts for the fact that the Size Amendment obligated the Developer to amend the condominium documents "[a]t or prior to closing" to reflect the as-built unit.  By their plain language and read as a whole, these provisions compel the conclusion that each time appellants received amended Condominium Documents, the 15-day cancellation period renewed.

9

The Developer's contention that the cancellation window closed 15 days after it furnished the original condominium documents would render section 2 of the Size Amendment—which required the Developer to construct Unit CU-1 "substantially in accordance with" the 3,628-square-foot floor plan—entirely superfluous and produce the absurd result of barring any recourse for an eleventh-hour as-built deviation, no matter the materiality. See Webster, 300 So. 2d at 755 ("A cardinal principle of contract interpretation is that the contract must be interpreted in a manner that does not render any provision of the contract meaningless.") (quoting Silver Shells Corp. v. St. Maarteen at Silver Shells Condo. Ass'n, Inc., 169 So. 3d 197, 203 (Fla. 1st DCA 2015)) (internal alterations omitted); see also Philip Morris Inc. v. French, 897 So. 2d 480, 489 (Fla. 3d DCA 2004) ("[A]n unambiguous contract cannot be interpreted to achieve absurd results."); Famiglio v. Famiglio, 279 So. 3d 736, 740 (Fla. 2d DCA 2019) ("Courts should not employ an interpretation of a contractual provision that would lead to an absurd result."); cf. Certified Motors, LLC v. Aventine Hill, LLC, 369 So. 3d 1254, 1262 (Fla. 2d DCA 2023) ("We refuse to inject uncertainty into a commercial contract where none is found on its face."); Pino v. Spanish Broad. Sys. of Fla., Inc., 564 So. 2d 186, 189 (Fla. 3d DCA 1990) (recognizing "the policy of preserving the sanctity of contract and providing

10

uniformity and certainty in commercial transactions"); Monopoly Realty, Inc. v. World Bus. Brokers, Inc., 562 So. 2d 387, 388 (Fla. 3d DCA 1990) (enforcing commercial contract for real estate commission pursuant to the "hoary principle stated over 100 years ago" that "[w]hen parties deliberately put their engagement into writing, in such terms as impart a legal obligation without any uncertainty as to the object or extent of their engagement, it is as between them, conclusively presumed that the whole engagement and the extent and manner of their undertaking is contained in the writing") (quoting Perry v. Woodberry, 7 So. 483, 485 (Fla. 1890)). Hence, we conclude that Paraiso properly cancelled the Agreement.[4]

## C

Paraiso further argues the trial court erred in failing to address its claim under FDUTPA, which alleged deceptive closing tactics and size representations. Section 501.212(7)(a), Florida Statutes (2015), exempts commercial property disputes from FDUTPA's protections if the contract expressly provides "for the process of resolution of any dispute . . . ." See

---

[4] Paraiso alternatively asserts the Developer breached the Size Amendment by delivering a unit measuring 3,314 square feet perimetrically instead of the 3,628 square feet depicted on the floor plan that was incorporated into the Agreement. The Developer contends that measured architecturally, not perimetrically, the unit satisfies the Size Amendment, and regardless, the disclaimer in section 14 addresses any variance in the unit's size. This ground for relief is distinct from section 36 of the Agreement.

id. ("This part does not apply to: . . . [c]auses of action pertaining to commercial real property located in this state if the parties to the action executed a written lease or contract that expressly provides for the process of resolution of any dispute and the award of damages, attorney's fees, and costs, if any . . . .").

The Agreement waives the right to a jury trial and mandates venue, but it does not expressly designate an exclusive process by which the parties are required to resolve any dispute. See Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp., 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008) ("The FDUTPA exemption at issue requires 'a written … contract that expressly provides for the process of resolution of any dispute.' GECC cites a series of provisions from the contract from which it contends one may infer that the parties intended to resolve any disputes regarding the contract by non-jury trial. However, none of the provisions cited by GECC support the proposition that a bench trial is the sole or even preferred process of dispute resolution agreed to by the parties. . . . Section 501.212(7)(a) requires that the written contract expressly provide for the process of resolution of any disputes. Merely citing a series of provisions that reference various mechanisms for dispute resolution which the parties may utilize fails to satisfy this standard.") (quoting § 501.212(7)(a), Fla. Stat.) (emphasis and ellipses in original)

(citations omitted).  Accordingly, the trial court must render further findings as to this claim, and we reverse and remand for further proceedings consistent herewith.

Reversed and remanded.