# Third District Court of Appeal

## State of Florida

Opinion filed July 10, 2025.

THIS OPINION IS NOT FINAL UNTIL DISPOSITION OF ANY FURTHER MOTION FOR REHEARING AND/OR MOTION FOR REHEARING EN BANC. ANY PREVIOUSLY-FILED MOTION FOR REHEARING EN BANC IS DEEMED MOOT.

_____

No. 3D23-1616
Lower Tribunal No. 23-16774
_____

**Angelica Avila, et al.,**
Appellants,

vs.

**Biscayne 21 Condominium, Inc., etc., et al.,**
Appellees.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Thomas J. Rebull, Judge.

Armstrong Teasdale LLP, and Glen H. Waldman and Jeffrey R. Lam, for appellants; Mager Paruas, LLC, and Scott Mager and Gary S. Gaffney (Hollywood), for appellant Franah Vazir-Marino.

Coffey Burlington, P.L., and Susan E. Raffanello for appellee TRD Biscayne, LLC; Cole, Scott & Kissane P.A., and Therese A. Savona (Orlando), for appellee Biscayne 21 Condominium, Inc.; Lawson Huck Gonzalez, PLLC, and Jason Gonzalez (Tallahassee), Jessica Slatten

(Tallahassee), and Robert E. Minchin III (Tallahassee), for appellee TRD Biscayne, LLC.

Frank A. Shepherd, P.A., and Frank A. Shepherd, for the Florida Chamber of Commerce, as amicus curiae.

DLA Piper LLP (US), and Harout J. Samra and Marie Bussey-Garza (Philadelphia, PA), for Castle Beach Club Condominium Association, Inc., and Miami Beach Club Motel Condominium Association, Inc., as amici curiae.

Greenberg Traurig, P.A., and Brigid Cech Samole, and David B. Weinstein (Tampa), Ryan T. Hopper (Tampa), and Jennifer M. Faggion (Tampa), for The Related Group, Fortune International Equity Corporation, Dezer Development LLC, and 13th Floor Manager, LLC, as amici curiae.

Before FERNANDEZ, LOBREE and BOKOR, JJ.

BOKOR, J.

## ON MOTION FOR REHEARING

We deny the Association and Developer's motion for rehearing but substitute the following revised opinion.[1]

Unit owner Angelica Avila and several other unit owners at the Biscayne 21 Condominium didn't take the money. Instead, the Owners voted against selling their units to TRD Biscayne, LLC, a developer attempting to

---

[1] The last pleading directed at the motion for rehearing was TRD Biscayne, LLC's April 25, 2025 renewed motion to expedite or, in the alternative, motion to lift stay. Avila responded on May 6, 2025. We deny the motion as moot upon the issuance of this opinion. Additionally, the "substantial revision of a majority opinion by the assigned panel renders moot an accompanying motion for rehearing en banc." §15, Third District Court of Appeal Internal Operating Procedures (amended Nov. 7, 2022).

terminate the condominium to redevelop and resell the property. The declaration of condominium required the unanimous assent of all unit owners to terminate the condominium. But the Association, acting on behalf of TRD Biscayne and now the owner of most of the units, didn't take no for an answer. Instead, the Association amended the declaration to change the unanimity requirement in the declaration to the current statutory floor of at least 80% of the unit owners' assent to terminate the condominium. The Owners filed suit and sought an injunction to block this change and the resulting termination, arguing that the declaration contained provisions requiring unanimity to terminate the condominium or amend any provision that impacts the voting rights of the unit owners. The trial court denied the temporary injunction, finding that an amendment to the voting threshold for termination from "the unanimous agreement of the Unit Owners" to 80% of the unit owners could be accomplished with a majority vote because such amendment didn't impact voting rights. The Owners appealed.[2] As explained below, we hold that an amendment changing the voting threshold for termination from 100% to 80% impacts the voting rights of the unit owners.

---

[2] We have jurisdiction. See Fla. R. App. P. 9.130(a)(3)(B).

3

We also analyze the declaration and find it does not contain Kaufman[3] language automatically incorporating the amended statutory threshold.

## I.

On December 10, 1974, through its recorded declaration of condominium, Biscayne 21 Condominium submitted "to condominium ownership, pursuant to Chapter 711, Florida Statutes, the Condominium Act, as amended." Article XIII.A. of the declaration expressly incorporated the then-existing statutory requirement of unanimity to terminate a condominium under section 711.16(1), Florida Statutes (1974): "The termination of the Condominium may be effected by the unanimous agreement of the Unit Owners . . . ." Article XII.A.2 of the declaration, governing amendments to the declaration, required the consent of 51% of the unit owners for most matters, but "an amendment altering . . . the voting rights of any of the Owners of the Condominium . . . shall require the approval of one hundred (100%) percent of the Owners." Additionally, Article XII.C provided that: "No amendment shall change . . . the voting rights appurtenant to any Unit, unless . . . all record owners . . . shall join in the execution of such amendments."

---

[3] Kaufman v. Shere, 347 So. 2d 627 (Fla. 3d DCA 1977).

The Owners purchased their units under this declaration with all the attendant rights and responsibilities. Over the years, like many older condominium buildings in Miami and beyond, Biscayne 21 attracted the attention of investors and developers. The condominium retained a commercial real estate firm to market the more than 170 units to interested parties, including developers like appellee TRD Biscayne. TRD Biscayne began purchasing units in bulk in May 2022 and, as owner of a substantial number of units, sought to terminate the condominium.

TRD Biscayne exercised its voting rights through the units it owned to take over the board of directors of the Association. In August 2022, the new board successfully approved, over objection of the Owners, two relevant amendments to the declaration. First, the board eliminated the unanimity requirement to terminate the condominium, replacing it with an 80% requirement consistent with the amended Condominium Act, which lowered the minimum threshold for termination from 100% to 80%. Second, the board amended Article I of the declaration to change the relevant language submitting to condominium ownership "pursuant to Chapter 718~~11~~, Florida Statutes, the Condominium Act, as amended <u>and/or renumbered from time to time</u>" (new language underscored, deleted language struck through). The

amendment also added a definition of Condominium Act in section 20 of Article II consistent with the amended language.

In September 2022, the Association approved a plan of termination, again over the objection of the Owners. In December 2022, the Association conveyed the former condominium property to TRD Biscayne, including the Owners' units. This Owners sued and requested a temporary injunction, which the trial court denied. The trial court found that the original declaration's submission to condominium in the initial clauses under the Condominium Act "as amended" did not trigger the automatic incorporation of the 80% threshold under Kaufman. The trial court nonetheless denied the injunction because it found that the Association properly amended the declaration, as the amendment of the unanimity provision didn't impact voting rights and was therefore subject to amendment by majority vote pursuant to Article XII.A.2. This appeal follows.

## II.

For a temporary injunction, the moving party must show "(1) a substantial likelihood of success on the merits, (2) the unavailability of an adequate remedy at law, (3) irreparable harm absent entry of an injunction, and (4) that the injunction would serve the public interest." Fla. Dep't of Health v. Florigrown, LLC, 317 So. 3d 1101, 1110 (Fla. 2021). To the extent

6

the trial court's decision to grant or deny an injunction is based on factual findings, our review is for abuse of discretion, but we review the court's legal conclusions, and interpretation of statutory and contractual provisions, de novo. Id.; Quirch Foods LLC v. Broce, 314 So. 3d 327, 337 (Fla. 3d DCA 2020).[4]

### III.

The declaration of condominium, often referred to as the condominium's "'constitution,' strictly governs the relationships among the condominium unit owners and the condominium association." First Equitable Realty III, Ltd. v. Grandview Palace Condo. Ass'n, Inc., 329 So. 3d 167, 170 (Fla. 3d DCA 2021) (quoting Woodside Vill. Condo. Ass'n, Inc. v. Jahren, 806 So. 2d 452, 456 (Fla. 2002)).

We interpret the provisions of a declaration of condominium consistent with general principles of contract interpretation. See McLlenan v. Cypress Chase N. Condo. No. 4 Ass'n, Inc., 387 So. 3d 321, 325 (Fla. 4th DCA 2024). So we do not read terms in isolation. "The words of a governing text are of

---

[4] As the trial court's denial here turned solely on the lack of a substantial likelihood of success, we constrain our analysis to that element. "A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. It is not enough that a merely colorable claim is advanced." City of Jacksonville v. Naegele Outdoor Advert. Co., 634 So. 2d 750, 753 (Fla. 1st DCA 1994).

paramount concern, and what they convey, in their context, is what the text means." Ham v. Portfolio Recovery Assocs., LLC, 308 So. 3d 942, 946 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012)); see also Conage v. United States, 346 So. 3d 594, 598–99 (Fla. 2022) (explaining that statutory interpretation does not invite "a threshold determination of whether a term has a 'plain' or 'clear' meaning in isolation," but requires consideration of "the statutory context" with "the aid of whatever canons might shed light on the interpretive issues in dispute"). We do not render any provision meaningless. Silver Shells Corp. v. St. Maarten at Silver Shells Condo. Ass'n, Inc., 169 So. 3d 197, 203 (Fla. 1st DCA 2015). We do not read terms to create absurd results. Famiglio v. Famiglio, 279 So. 3d 736, 740 (Fla. 2d DCA 2019).

The declaration of condominium at issue requires unanimity for any amendments altering the "voting rights" of the unit owners:

> [P]roposals, adoptions and approvals [of amendments] must be by not less than fifty-one (51%) percent of the members of the Association, except as to an amendment altering the percentages of ownership in the Common Elements or the voting rights of any of the Owners of the Condominium, any of which shall require the approval of one hundred (100%) percent of the Owners.
>
> . . . .
>
> No amendment shall change any Condominium Unit nor the share of the Common Elements, Common Expenses or

8

> Common Surplus attributable to any Unit, nor the voting rights appurtenant to any Unit, unless the record Owner or Owners thereof and all record owners of liens upon such Unit or Units shall join in the execution of such amendments.

The declaration also originally allowed termination of the condominium only upon the "unanimous agreement of the Unit Owners and all institutional mortgagees." So the first issue concerns the interplay between the two provisions. That is, under the amendment clause, could the Association amend the unanimous agreement for termination provision by a simple majority vote? Or does the amendment impact "voting rights" or "voting rights appurtenant to any Unit," requiring unanimous consent to amend? The second issue is whether the declaration incorporates sufficient Kaufman language such that the declaration was automatically amended by the changed language of the Condominium Act, section 718.117(3), Florida Statutes (2022), which allows termination of a condominium pursuant to a plan of termination approved by at least 80% of the total voting interests of the condominium. We address each in turn.[5]

## IV.

## A. Voting Rights

---

[5] The trial court did not rely on the Kaufman language argument, as it found that the amendment of the unanimity requirement for termination to an 80% threshold did not impact voting rights. We review both issues de novo.

9

The Owners argue that the change to the termination vote threshold materially altered unit owners' voting rights. The unit owners were vested by their declaration, their "constitution," with a veto right, and the contractual right to a unanimous vote threshold before they would be divested of their condominium. The Association and Developer argue for a more constrained interpretation of "voting rights." Voting rights means the right to vote, so because each unit owner can cast a vote, and that vote is counted, there is no impairment of voting rights. But it is "voting rights," not "right to vote." And context matters.

We don't look at the terms "voting rights" and "voting rights appurtenant to any Unit" in a vacuum. Instead, we examine the text "as a whole" including "all the textual and structural clues that bear on the meaning of a disputed text." Conage, 346 So. 3d at 598 (quotations omitted); see also Ehrlich v. Barbatsis Holding Co., 63 So. 2d 911, 913 (Fla. 1953) ("Courts should attempt to give words and phrases used in contracts the natural meaning or that meaning most commonly understood when considered in reference to subject matter and circumstances. . . . Such meaning will depend on the subject matter to which the words relate and the purpose of their use. The intent of the quoted language may vary with the circumstances and such words will not essentially convey the same connotations under all

10

circumstances."). In examining the terms "voting rights" and "voting rights appurtenant to any Unit" in the context of the section in which the terms appear as well as in conjunction with the termination provision, we conclude that the plain language demanded a unanimous vote to alter the voting threshold. By requiring a unanimous vote for termination, the declaration originally gave every unit owner an effective veto over any termination plan, which would be lost if the amendments at issue here were enforced. See Tropicana Condo. Ass'n, Inc. v. Tropical Condo., LLC, 208 So. 3d 755, 759 (Fla. 3d DCA 2016) (finding that non-unanimous amendments to declaration reducing vote threshold for termination of condominium could not be applied where declaration expressly required unanimous vote to amend termination provision and the "amendment, if retroactively applied, would eviscerate the Tropical owners' contractually bestowed veto rights").

The Association and Developer argue that the plain language of Biscayne 21's bylaws, incorporated by reference into the condo declaration, mandate the narrow reading of voting rights as one vote for each unit owned, and no more. But the provision referred to in the bylaws is not—and does not purport to be—a definition:

2. Members.

. . . .

11

3. <u>Voting Rights</u>. The members of the Association shall be entitled to cast one vote for each Condominium Unit owned by them.

This is because context matters. The provision is not contained in a definition section. And the text doesn't read as a definition in context. Rather than defining voting rights, the text of this subsection spells out the unremarkable principle that each member has the right to cast one vote for each unit owned. Nothing more. It would be a stretch, unsupported by contextual clues and the text of the subsection, to conclude that this sentence contained in the members section was meant to define voting rights at all, much less as one sole right (the right to vote) at the exclusion of other voting rights. Nor would it be logically sound under applicable canons of construction or principles of contractual interpretation. This general description of one vote per unit owned in the bylaws, describing the mechanical tabulation of how many votes a member gets (untethered to a definitional section) was meant to abridge or limit express, specific provisions found in the declaration.

Against that backdrop, we find no inconsistency or ambiguity in the use of the subtitle "voting rights." As explained, we read the text as written and read it in context. It does not purport to be a definition of voting rights. At most, it details a voting right in the context of a member's right to cast one

vote for each unit. As further explained in the context of contractual interpretation:

> Even if there were an inconsistency between the title of the clause and the terms thereof, " 'text wins' in 'a war between text and title[.]' " [Florida Fish & Wildlife Conservation Commission v.] Hahr, 326 So. 3d [1165], 1170 [(Fla. 1st DCA 2021)] (Jay, J., specially concurring) (quoting Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286, 293 (5th Cir. 2020) (citing Reading Law: The Interpretation of Legal Texts 222-23)); see also Hinely v. Fla. Motorcycle Training, Inc., 70 So. 3d 620, 624 (Fla. 1st DCA 2011) ("[T]he headings or subheadings of a document do not dictate the meaning of the entire agreement, especially where the literal language of the heading is contrary to the agreement's overall scheme."); Certain Underwriters at Lloyds of London v. Pero Fam. Farm Food Co., No. 20-12711, 2023 WL 2855844 at *6 (11th Cir. Apr. 10, 2023) (quoting Hinely, 70 So. 3d at 624).

Prop. Registration Champions, LLC v. Mulberry, 373 So. 3d 675, 681 (Fla. 5th DCA 2023). And since "text wins," we conclude that the language of the subsection does what it purports to do—establishes one vote per unit—but doesn't function as a definition of voting rights.

The plain language of the section of the declaration governing amendment doesn't support the constrained reading limiting voting rights to the bare right to vote. Instead, the amendment section requires 100% approval of an "amendment altering the percentages of ownership in the Common Elements or the voting rights of any of the Owners of the Condominium." (emphasis added). The term "altering" doesn't mean the same thing as "eliminating." The language does not contemplate simply a

13

binary situation of a right to vote or no right to vote, but "mak[ing] different without changing into something else" or "becom[ing] different." Alter, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/alter; see also State v. Carrier, 240 So. 3d 852, 857 (Fla. 2d DCA 2018) (setting forth the "ordinary meaning of the word 'alter'" as "'to change or modify and to make different in some particular characteristic without changing it into something else'" and examining the word in context "[u]nder the doctrine of *noscitur a sociis* (a word is known by the company it keeps" (citations and quotations omitted))). The Owners' voting rights aren't eliminated, and they haven't changed "into something else" by the change of the voting threshold, but surely they have been changed, modified, or made different in some particular characteristic—they no longer have the characteristic of a veto.[6]

We find further contextual support in examining the amendment provision of the declaration in conjunction with the termination provision's requirement of "unanimous agreement of the Unit Owners and all institutional mortgagees." In context, the "unanimous agreement" means a unanimous

---

[6] The same analysis would apply to the next paragraph of the amendment section, examining the requirement that "[n]o amendment shall change . . . the voting rights appurtenant to any Unit, unless the record Owner or Owners thereof . . . join in the execution of such amendments." (emphasis added).

14

vote. It seems unlikely that a unit owner (or anyone else) reading those provisions together would conclude that a change from a unanimous vote to some other threshold wouldn't constitute a modification, change, or an alteration of a particular characteristic of a unit owner's voting rights.

We need not leave the confines of Florida or our established principles of contractual interpretation. But our conclusion is nonetheless supported by consistency with numerous other state and federal cases that have interpreted the concept of "voting rights" more broadly to encompass not only the right of each voter to be able to cast a vote, but also to safeguard against vote dilution or diminution. In the context of condominium law, California's Fourth District Court of Appeals has also interpreted "voting rights" to encompass alterations to the relative voting power of a voting group as well as outright denial of the right to cast a vote. See Lake Arrowhead Chalets Timeshare Owners Ass'n. v. Lake Arrowhead Chalets Owners Ass'n., 59 Cal. Rptr. 2d 875, 877 (Cal. Ct. 4th App. 1996) (finding amendment to condominium bylaws without unanimous approval unlawful under code provision preventing amendments that would "[m]aterially and adversely affect the rights, privileges, preferences, restrictions or conditions of that class as to voting" without approval of entire affected class of members with same voting rights).

In the federal voting rights context, the voting rights encompassed by the Voting Rights Act of 1965 and the Fourteenth Amendment prohibit not just infringement of the ability to cast a ballot, but also infringement of the right to have such ballot be counted and impact the election, including by dilution of relative voting power. See Reynolds v. Sims, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing. . . . [T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (citations omitted)); Voinovich v. Quilter, 507 U.S. 146, 153–54 (1993) (describing vote-dilution effect of racial gerrymandering). In the context of shareholder rights, the Minnesota Supreme Court has held that elimination of a minority corporate shareholder's effective veto constituted a deprivation of the shareholder's "voting rights." See Whetstone v. Hossfeld Mfg. Co., 457 N.W.2d 380, 383–84 (Minn. 1990) ("The phrase 'excludes or limits the right of a shareholder to vote' is somewhat ambiguous. It could refer to the basic eligibility to vote (*i.e.,* the difference between voting stock and non-voting stock) or it could refer to the operative effect of the shareholder's right to vote. . . . Eliminating a minority shareholder's veto power over decisions of the majority shareholder, particularly in cases such

16

as this, unquestionably limits the voting rights of the minority shareholder." (footnote omitted)).

We therefore conclude that the trial court erred in determining that the declaration permitted amendment of the voting threshold from unanimity to an 80% vote share by a simple majority vote.

### B. Kaufman Language

So the declaration required a unanimous vote to terminate or amend the termination threshold. We next address whether the amendment to the Condominium Act lowering the permissible threshold from unanimity for termination to an 80% threshold automatically amends the declaration, specific contractual language notwithstanding. To do this, we must examine whether the declaration contains Kaufman language, that is, provisions that automatically incorporate amendments of the Condominium Act into the declaration. And if we do find such language, we must determine whether the Kaufman language applies to the portions of the declaration at issue.

The 1974 version of the Condominium Act (the year in which the declaration was adopted) allowed termination upon unanimous vote or "in such other manner as may be prescribed in the declaration." § 711.16(3), Fla. Stat. (1974). Without repeating the language of the termination provision (again), we note that the termination provision itself doesn't expressly

17

reference the Condominium Act as amended. But the Association and the Developer contend that the declaration incorporated all future amendments to the Condominium Act passed since its adoption, and thus that the Condominium Act, as most recently amended, controls over any conflicting, express provisions in the declaration. But this argument misreads the language of the declaration, misapplies this court's decision in Kaufman, and conflicts with longstanding principles of contract interpretation.

First, the contractual language the Association and Developer rely on, contained in Article I, "Establishment of Condominium," submitted to condominium ownership under the Condominium Act, as amended. That's it. Prior to the 2022 amendments, there was no Kaufman language anywhere in the declaration. Additionally, the provision in the declaration considered by Kaufman contained a specific reference to amendment by the Condominium Act, as amended from time to time:

> The critical contested provision of the Declaration reads as follows:
>
> 1. Except where variances permitted by law appear in this Declaration or in the annexed By-Laws or in the annexed Charter of FIFTH MOORINGS CONDOMINIUM, INC., or in lawful amendments thereto, the provisions of the Condominium Act as presently existing, <u>or as it may be amended from time to time</u>, including the definitions therein contained, are adopted and included herein by express reference.

18

<u>Kaufman</u>, 347 So. 2d at 628 (emphasis added, quotations omitted). Against that backdrop, <u>Kaufman</u> concluded that an amendment to the Condominium Act which declared rent escalators as void against public policy should be read into that declaration prospectively. <u>Id.</u> Here, the declaration contained no <u>Kaufman</u> language. As this court previously held, "[a]bsent <u>Kaufman</u> language, an amendment to the Condominium Act will not have retroactive application to a condominium's Declaration if it impairs contractual obligations." <u>Tropicana Condo.</u>, 208 So. 3d at 758 (citing <u>Cohn v. Grand Condo. Ass'n, Inc.</u>, 62 So. 3d 1120, 1121–22 (Fla. 2011)). Because the amendment to the Condominium Act impairs contractual obligations, the lack of <u>Kaufman</u> language prohibits incorporation of such amended language into the declaration.

Second, unlike <u>Kaufman</u>, the declaration at issue contains no "express intention of all parties concerned that the provisions of the Condominium Act [as amended] were to become a part of the controlling document . . . whenever they were enacted." 347 So. 2d at 628. The language at issue here is not, as in <u>Kaufman</u>, an incorporation of the Condominium Act as amended into the contested clause itself. Nor does the declaration expressly provide as a general matter that any amendment to the Condominium Act acts to amend express language to the contrary. The declaration of

condominium could have contained <u>Kaufman</u> language that explicitly and automatically amended each clause when the relevant portion of the Condominium Act was changed. It didn't. Rather, the relevant clause is a mere recital that the building is submitted "to condominium ownership, pursuant to Chapter 711, Florida Statutes, the Condominium Act, as amended . . . *upon the terms, conditions, restrictions, reservations and limitations contained herein*." (emphasis added).

Third, in <u>Kaufman</u>, the relevant amendment to the Condominium Act rendered an existing provision of the declaration void as against public policy. Here, the unanimous voting requirement in the termination section of the declaration doesn't offend public policy. The new law sets a lower floor on the voting threshold (approval by "at least 80 percent of the total voting interests of the condominium" and rejection by less than 5 percent "of the total voting interests"). <u>See</u> § 718.117(3), (3)(a)2., Fla. Stat. But it contains no expression of retroactivity. The relevant voting rights provision contains an unambiguous expression of intent. The plain language of the declaration controls, and the specific, unambiguous language of the termination clause and the amendments clause controls over the general provision submitting the building to condominium form of government. <u>See, e.g.</u>, <u>Pardes v. Pardes</u>, 335 So. 3d 1241, 1251 (Fla. 3d DCA 2021) ("It is apodictic that,

under contract law, the more specific contractual provision controls over the general provision." (citing Papunen v. Bay Nat'l Title Co., 271 So. 3d 1108, 1111 (Fla. 3d DCA 2019))).

### C. Certification of Question of Great Public Importance

The Association and Developer seek certification to the Florida Supreme Court of two questions of great public importance. See Fla. R. App. P. 9.330(a)(2)(C). The definition of "voting rights" likely applies to many condominium declarations and impacts condominium unit owners' rights and obligations. We therefore agree to certify a rephrased version of one of the questions as being of great public importance:

> MAY AN AMENDMENT ALTERING THE VOTING THRESHOLD REQUIRED TO TERMINATE A CONDOMINIUM PASS WITHOUT UNANIMOUS APPROVAL WHERE A CONDOMINIUM DECLARATION BOTH: (1) REQUIRES THE UNANIMOUS APPROVAL OF THE UNIT OWNERS BEFORE EITHER TERMINATING THE CONDOMINIUM OR PASSING ANY AMENDMENT TO THE DECLARATION OF CONDOMINIUM ALTERING A UNIT OWNER'S "VOTING RIGHTS" AND (2) LACKS LANGUAGE PURSUANT TO KAUFMAN V. SHERE, 347 SO. 2D 627 (FLA. 3D DCA 1977), AUTOMATICALLY INCORPORATING RELEVANT STATUTORY CHANGES INTO SUCH CONTRACTUAL PROVISIONS?

### V.

The Association and Developer, as well as some of the amici, also discuss the policy implications of this court's decision. This court does not

assume the role of the legislature, nor can we overextend statutes beyond

their stated limitations, rewrite contracts, or impair contractual obligations

because of policy preferences.[7] For the reasons explained, the Owners have

shown a substantial likelihood of success on the merits. We therefore

reverse and remand for entry of a temporary injunction.

Reversed and remanded; question certified.

---

[7] There may be good policy reasons to allow a lower threshold for termination of condominium. There also may be good policy reasons to allow a unit owner to rely on the rights outlined in the declaration of condominium when the condominium was purchased. But we do not set policy. We instead apply the law and interpret the declaration as written. See, e.g., State v. Rife, 789 So. 2d 288, 292 (Fla. 2001) ("When faced with an unambiguous statute, the courts of this state are 'without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.' This principle is 'not a rule of grammar; it reflects the constitutional obligation of the judiciary to respect the separate powers of the legislature.'" (citations omitted)); see also Art. II, § 3, Fla. Const. (setting forth separation of powers).